# 22-596

## United States Court of Appeals for the Second Circuit

REGINA ORSAIO,

*Plaintiff-Appellant,*

v.

NEW YORK STATE DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION,

*Defendant-Appellee,*

ANTHONY ANNUCCI, Acting Commissioner of DOCCS, RONALD HESS, Bureau Chief, SUSAN HROVAT, Senior Parole Officer

*Defendants.*

————————————

On Appeal from the United States District Court for the Northern District of New York

## BRIEF FOR DEFENDANT-APPELLEE

BARBARA D. UNDERWOOD
  *Solicitor General*
ANDREA OSER
  *Deputy Solicitor General*
SEAN P. MIX
  *Assistant Solicitor General
  of Counsel*

LETITIA JAMES
  *Attorney General of the
  State of New York*
Attorney for Appellee
The Capitol
Albany, New York 12224
(518) 776-2010

Dated: September 28, 2022

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................iv

PRELIMINARY STATEMENT ..............................................................1

QUESTIONS PRESENTED .................................................................3

STATEMENT OF THE CASE .............................................................4

    A.   Orsaio Believes Her Bureau Chief's View of Her Changed When He Learned She Was Gay. .............................................5

    B.   Orsaio Objects to Numerous Workplace Decisions as Discriminatory and Hostile, Rather than Based on Operational Need. ......................................................8

        1.   Orsaio Objects to Caseload Assignments. ..........................8

        2.   Orsaio Is Not Permitted to Change Her Assigned Duty Day. ....................................................14

        3.   Orsaio Is Not Selected for a One-Time Overtime Job. ....16

        4.   Orsaio Is Permitted to Pursue Opportunities for Supplemental Outside Employment but Alleges Undue Interference. ..........................................17

    C.   DOCCS Awards Orsaio a Requested Position as a Polygraph  Examiner, But She Does Not Succeed in the Position. ...............................................................18

    D.   Orsaio Files an Administrative Discrimination Complaint with New York's Division of Human Rights. .......25

    E.   Orsaio Thereafter Fails To Provide Adequate Justification for Requested Overtime Reimbursement and Continues to Have Time Management Issues. ...............27

i

F.    Orsaio Receives a Critical Performance Evaluation. ............. 32

G.    Orsaio Files a Second Administrative Complaint with
the New York's Division of Human Rights, this Time
Alleging Retaliation. ................................................ 33

H.    Orsaio Alleges Ongoing Hostility After Her Second
Administrative Complaint ........................................ 34

I.    Orsaio Commences this Litigation and the District Court
Issues the Decisions Challenged on Appeal .......................... 35

STANDARD OF REVIEW ................................................... 41

SUMMARY OF ARGUMENT ................................................. 42

ARGUMENT

POINT I

THE DISTRICT COURT PROPERLY GRANTED
SUMMARYJUDGMENT REJECTING THE SEX
DISCRIMINATION AND HOSTILE WORK ENVIRONMENT
CLAIMS ............................................................... 44

A.    The District Court Properly Rejected as Untimely
Orsaio's Sex Discrimination and Hostile Work
Environment Claims. ............................................. 44

B.    Plaintiff Failed In Any Event to Present Evidence
Sufficient to Warrant a Trial on Her Discrimination
Claim. ........................................................... 46

C.    Plaintiff Similarly Failed to Present Evidence Sufficient
to Warrant a Trial on Her Hostile Work Environment
Claim. ........................................................... 56

**Page**

POINT II

THE DISTRICT COURT'S EVIDENTIARY DECISIONS WERE
NOT AN ABUSE OF DISCRETION.......................................................63

CONCLUSION ........................................................................71

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases**                                                      **Page(s)**

*Alfano v. Costello,*
  294 F.3d 365 (2d Cir. 2002) ................................. 57, 58, 61

*Baldwin Cnty. Welcome Ctr. V. Brown,*
  466 U.S. 147 (1984)............................................... 44

*Bostock v. Clayton County,*
  —— U.S. ——, 140 S. Ct. 1731, 207 L.Ed.2d 218 (2020) ..................... 1

*Brown v. Henderson,*
  257 F.3d 246 (2d Cir. 2001) ................................... 57

*Buckley v. Mukasey,*
  538 F.3d 306 (4th Cir. 2008)................................. 67

*Cuoco v. Moritsugu,*
  222 F.3d 99 (2d Cir. 2000) .................................... 49

*Demoret v. Zegarelli,*
  451 F.3d 140 (2d Cir. 2006) .................................. 56

*Faragher v. City of Boca Raton,*
  524 U.S. 775 (1998)............................................. 57

*Feingold v. New York,*
  366 F.3d 138 (2d Cir. 2004) .................................. 50

*Ferris v. Delta Air Lines, Inc.,*
  277 F.3d 128 (2d Cir. 2001) .................................. 56

*Fincher v. Depository Tr. & Clearing Corp.,*
  604 F.3d 712 (2d Cir. 2010) .................................. 56

*Glass v. Philadelphia Electric Co.,*
  34 F.3d 188 (3d Cir. 1994) ................................... 67

*Hardaway v. Hartford Pub. Works Dep't,*
  879 F.3d 486 (2d Cir. 2018) .................................. 47

| Cases | Page(s) |
|---|---|

*Harris v. Forklift Sys., Inc.*,
    510 U.S. 17 (1993).................................................................. 56, 61

*Hawkins v. Hennepin Tech. Ctr.*,
    900 F.2d 153 (8th Cir. 1990)...................................... 67, 68

*Isaacson v. New York Organ Donor Network*,
    405 F. App'x 552 (2d Cir. 2011) ........................................ 46

*Jackson v. Federal Express*,
    766 F.3d 189 (2d Cir. 2014) ............................................... 48

*Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*,
    716 F.3d 10 (2d Cir. 2013) ................................................. 64

*Kotcher v. Rosa & Sullivan Appliance Ctr.*,
    957 F.2d 59 (2d Cir. 1992) ................................................. 61

*Lenzi v. Systemax, Inc.*,
    944, F.3d 97, 112 (2d Cir. 2019) ........................................ 63

*Liebowitz v. Cornell Univ.*,
    584 F.3d 487 (2d Cir. 2009) ............................................... 50

*LoSacco v. City of Middleton*,
    71 F.3d 88 (2d Cir. 1995) ................................................... 35

*McDonnell Douglas Corp. v. Green*,
    411 U.S. 792 (1973)..................................................... 49, 68

*Miner v. Clinton County*,
    541 F.3d 464 (2d Cir. 2008) ............................................... 41

*Reeves v.Snaderson Plumbing Prods., Inc.*,
    530 U.S. 133 (2000)............................................................ 41

*Rivera-Rivera v. Medina & Medina, Inc.*,
    898 F.3d 77 (1st Cir. 2018) ................................................ 62

*Robinson v. Concentra Health Servs., Inc.*,
    781 F.3d 42 (2d Cir. 2015) ................................................. 41

**Cases**                                                   **Page(s)**

*Schwapp v. Town of Avon,*
   118 F.3d 106 (2d Cir. 1997) ........................................................ 57, 61

*Sherlock v. Montefiore Med. Ctr.,*
   84 F.3d 522 (2d Cir. 1996) ................................................................ 44

*Tiberio v. Allergy Asthma Immunology of Rochester,*
   664 F.3d 35 (2d Cir. 2011) ................................................................ 45

*United States v. Brennan,*
   650 F.3d 65 (2d. Cir. 2011) ............................................................... 50

*United States v. McGinn,*
   787 F.3d 116 (2d Cir. 2015) .............................................................. 42

*United States v. Stillwell,*
   986 F.3d 196 (2d Cir. 2021) .............................................................. 62

*Univ. of Tex. Sw. Med. Ctr. v. Nassar,*
   570 U.S. 338 (2013) ........................................................................... 64

*Van Zant v. KLM Royal Dutch Airlines,*
   80 F.3d 708 (2d Cir. 1996) ................................................................ 57

*Vega v. Hempstead Union Free Sch. Dist.,*
   801 F.3d 72 (2d Cir. 2015) ........................................................... 47, 50

*Weinstock v. Columbia Univ.,*
   224 F.3d 33 (2d Cir. 2000) ................................................................ 41

*Woodman v. WWOR-TV, Inc.,*
   411 F.3d 69 (2d Cir. 2005) ................................................................ 41

**Federal Statutes**

42 U.S.C.
   § 1983 ................................................................................................ 35
   § 2000e–2000e(17)....................................................................passim
   § 2000e-5(e) ...................................................................................... 47
   § 2000(f)............................................................................................. 47

## New York State Statutes                                    Page(s)

Correction Law
    § 701 ................................................................................ 19

Mental Hygiene Law
    article 10 .......................................................................... 8

Penal Law
    § 70.40(2) ......................................................................... 20

Human Rights Law, Executive Law
    §§ 290–301 ...................................................................... 35

## Federal Rules and Regulations

Fed. R. Civ. P. 56(a) ................................................................ 41

Rule 801(d)(2)(D) .................................................................... 69

Rule 803(1) ............................................................................. 69

## PRELIMINARY STATEMENT

Plaintiff Regina Orsaio is a parole officer employed by defendant-appellee New York Department of Corrections and Community Supervision ("DOCCS"). She alleges that DOCCS discriminated against her based on sexual orientation,[1] subjected her to a hostile work environment, and retaliated against her for complaining about that conduct, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2000e(17).

The United States District Court for Northern District of New York (Sannes, J.) granted DOCCS summary judgment on Orsaio's sex discrimination and hostile work environment claims. It held that the claims were not filed within the requisite 90-day period from Orsaio's presumed receipt of the right-to-sue letter for those claims and that Orsaio failed in any event to create a triable issue of fact as to either claim. Orsaio's retaliation claim, in contrast, was filed within the

---

[1] Because the Supreme Court has explained that discrimination on the basis of sexual orientation is a form of sex discrimination covered by Title VII, *Bostock v. Clayton County*, —— U.S. ——, 140 S. Ct. 1731, 207 L.Ed.2d 218 (2020), we refer here to Orsaio's discrimination claim as one of "sex discrimination."

requisite 90-day period of the separate right-to-sue letter issued for that claim, and the district court found issues of fact sufficient to warrant a trial. At the ensuing trial, the court reasonably exercised its discretion to admit evidence of the alleged discrimination and hostile work environment claims as background information to the extent relevant to the retaliation claim. The court precluded Orsaio, however, from introducing purported corroborating evidence of those claims in order to avoid confusing the jury, unnecessarily extending the trial and prejudicing the defendant. The jury returned a verdict in favor of defendant, final judgment was entered rejecting Orsaio's complaint in its entirety and this appeal ensued.

The Court should affirm. The district court properly granted DOCCS summary judgment on Orsaio's discrimination and hostile work environment claims because they were time-barred and, alternatively, because the record lacked sufficient evidence to create a material question of fact warranting a trial. And the district court acted well within its discretion in weighing how much of the evidence purportedly supporting Orsaio's time-barred claims of discrimination and hostile work environment was probative of and relevant to her retaliation claim

2

but would not unduly prejudice the defendant. Accordingly, this Court should affirm.

## QUESTIONS PRESENTED

1.      Did Orsaio fail to present evidence sufficient to overcome the presumptions that the right-to-sue letter was both timely mailed and received, thus warranting dismissal of her claims of sex discrimination and hostile work environment as time barred?

2.      Did Orasio fail in any event to present evidence sufficient to raise a material issue of fact as to either of those claims?

3.      Did the district court reasonably exercise its discretion in allowing the admission at trial on the retaliation claim of some evidence of the alleged prior sex discrimination and hostile work environment, while precluding Orsaio from presenting her entire case of those failed claims in order to avoid confusing the jury and prejudicing the defendant?

## STATEMENT OF THE CASE[2]

Plaintiff-appellant Orsaio identifies as a homosexual female and describes herself as not "conform[ing] to traditional gender stereotypes" or a "layperson's idea of what a typical female should look like." (JA274-275, 455.) She "wear[s] men's clothing." (JA274-275, 455.) She has been employed as a parole officer with DOCCS since 2006. (Joint Appendix ["JA"]255-256, 2018). She began her career in DOCCS's Syracuse office and transferred to the Utica area office in 2008. (JA504.) She remained in the Utica office until 2016, when she transferred back to Syracuse. (JA255.) In 2017, Orsaio returned to the Utica office. (JA142.)

Parole officers are assigned a caseload of parolees to supervise. Parole officers report to senior parole officers (JA750), who in turn report to supervising parole officers, known as "bureau chiefs" (JA497). Defendant Ron Hess served as the bureau chief for the Utica area office from 2012 until his retirement in 2017. (JA143.) The Utica area office is

---

[2] The following facts are undisputed, unless specifically noted otherwise, and presented in the light most favorable to Orsaio, as required when this Court reviews a summary judgment ruling.

responsible for parolees in seven counties, including Oneida, where the city of Utica is located, Otsego, and Herkimer. (JA578.)

## A. Orsaio Believes Her Bureau Chief's View of Her Changed When He Learned She Was Gay.

Orsaio believes that Hess learned that she was gay sometime after September 2014, because that was when she noticed Hess change his behavior toward her. (JA161, 275.) Before then, her relationship with Hess was "fine." (JA278.) She did not socialize with him, but she occasionally "spoke to him." (JA279.) Orsaio claims that, after September 2014, Hess stopped speaking to her. (JA278.)

Orsaio never discussed her sexual orientation with Hess, nor did he ever bring it up with her.[3] (JA162, 276-277, 282.) She did not post pictures of girlfriends or significant others in her office space, and she was not on social media. (JA162, 275-276.) Orsaio did, however, discuss her sexual orientation with "a few of the secretaries" in the office and one

---

[3] Defendant Hess testified that he was not aware of plaintiff's sexual orientation until after she filed her May 2016 discrimination complaint. (JA490.) He also testified that he "never asked people what their preferences are" or "what their personal behaviors are," and that he has no objections to homosexuality. (JA491-492.)

5

of her colleagues. (JA276.) In addition, another parole officer met Orsaio's girlfriend outside the office once. (JA284.)

Orsaio assumes that because some of her colleagues were friendly with Hess, they talked to him about her sexual orientation. (JA275-276.) Orsaio has never heard Hess make a derogatory comment about anyone's sexual orientation, but she said that two parole officers told her that Hess did not like her. (JA277, 282-283.) And one of those officers—Schwarz-Castillo—reportedly told her it was because she "don't like cock." (JA283.) Orsaio also said that Hess gave her "filthy looks," once said "douche bag" after she walked by, and once seemed to be mimicking her limp in front of secretaries. (JA285, 366.)

In November 2014, Hess awarded Orsaio a "Bureau Commendation" for allowing local television crews to ride with her on Halloween night during her field work. (JA1280.) Hess's commendation praised Orsaio's "insightfulness" and "diligent efforts," and said her "exemplary" actions "distinguished [her] as a valuable asset to the Utica" office. (JA1280.) A year later, Hess recommended Orsaio as his top choice for a polygraph position she requested, a position that required additional training and certification at DOCCS's expense. (JA156, 667-

6

668; *see also* JA1290.) Nevertheless, Orsaio believed that Hess "was keeping [her] isolated" and would not "let [her] participate in anything." (JA330.) She claimed that "all of the officers knew what he was doing" and that he "directed everyone not to talk to [her] or work with [her]." (JA330.) She believed that the other officers "were all afraid of him" and complied. (JA332.) At some point between 2014 and 2015, Orsaio recalled another parole officer asking why she had "no tie today," which she thought was part of Hess's plan to "put[] the whole office against [her]." (JA162, 455-456.) Orsaio never approached Hess to discuss any of these concerns. (JA298.)

Around October 2015, Orsaio discovered that someone had drawn a beard and mustache on a photograph of her that was posted on the office bulletin board. (JA163, 337.) Other photographs on the bulletin board had also been defaced, including markings over the face of male employees. (JA163.) Orsaio did not know whether Hess knew about the defaced photos, and she did not report the photo to her supervisor, human resources, or Hess. (JA187, 342.) Hess testified that he was unaware of the photo until several months later, after Orsaio filed her discrimination complaint. (JA163.)

7

Because Orsaio believed that Hess, on learning she was gay, no longer liked her, she assumed that every seemingly unfavorable workplace decision Hess made constituted an act of discrimination on the basis of sexual orientation, as well as part of a pattern of hostility toward her, rather than a decision based on operational need.

## B. Orsaio Objects to Numerous Workplace Decisions as Discriminatory and Hostile, Rather than Based on Operational Need.

### 1. Orsaio Objects to Caseload Assignments.

Each parole officer is assigned a caseload of parolees to supervise. To balance the workload among parole officers, DOCCS assigns a weighted value to each parolee, as determined by the parolee's risk assessment. For example, a parolee on strict and intensive supervision and treatment ("SIST") under New York Mental Hygiene Law article 10 (the State's civil commitment statute for sex offenders) is weighted at 1/10, meaning a single parole officer would ideally supervise no more than 10 such parolees. (JA 158, 990.) Other sex offenders are weighted at 1/25, and other parolees may be weighted at 1/40, 1/80, or 1/160. (JA158, 990, 994.) Ideally, each parole officer's caseload adds up to 1.00, a full caseload. (JA159, 994.)

DOCCS cannot control the number of parolees released to the region served by its various offices or the number of parolees supervised by its various offices who will violate their parole or finish their parole term in any given month. (JA993.) Nor can DOCCS control the factors determining the weighted values assigned to the parolees supervised by its various offices. Accordingly, parole officers have fluctuating caseloads comprised of varying numbers of parolees with varying weighted values (JA159, 990), and it is not unusual for a parole officer to have a caseload that exceeds the 1.0 goal for periods of time (*see, e.g.*, JA159, 1376). Given the dynamic nature of parole officers' caseloads, however, DOCCS adds staff to an office only when a longer-term trend shows that the office has experienced an increase in parolee population over time. (JA159, 996.)

As for caseload assignments, in the Utica area office, if a parole officer is promoted, retires, or assumes a different caseload, the vacated caseload is posted as available by the bureau chief and awarded to the most senior parole officer who requests it. (JA146, 622-623.) Once a parole officer is assigned to a new caseload, that officer's old caseload is posted. The officer cannot assume the new caseload, however, until the old caseload is staffed, and there are "many variables" that delay the

9

transfer of caseloads, such as staffing or budget issues. (JA645, 1170-1171.)

In 2011, Orsaio applied for and was assigned to a caseload of parolees on SIST. (JA158.) Parolees on SIST are sex offenders who have been found to present a sufficient risk of recidivism to warrant civil management under the State's civil commitment law. (JA158, 985.) Unlike other caseloads, assignment to a SIST caseload requires additional reporting and supervision for each SIST parolee. (JA158, 519.) A SIST caseload is therefore the smallest of the caseloads in number, with a target ratio of 10 parolees to 1 parole officer. (JA158, 517, 986.) In the Utica area office, there is only one parole officer responsible for SIST parolees. (JA593.)

Orsaio believed that "towards the end of 2014, beginning of 2015," Hess began increasing her caseload because of her sexual orientation. (JA159, 294-295.) A Bureau Staffing Report from July 2015 lists Orsaio's caseload number as 1.37. (JA159, 1376.) At that time, the Utica office was short staffed, resulting in somewhat higher caseloads for other officers as well. (JA159, 1044-1046.) For example, parole officer DiMaggio's caseload

was 1.47; parole officer Jolma's caseload was 1.31; and parole officer Carswell's caseload was 1.22. (JA159, 1376.)

Marco Ricci, DOCCS's Regional Director for the Central New York Region at the time, testified that, although not ideal, a 1.37 caseload is not considered high. (JA978, 1041.) As Ricci explained, caseloads are "dynamic" and can fluctuate each month depending on who violates parole or is released to parole. (JA1041.) Indeed, by September 2015, Orsaio's caseload was down below 1.0, to .98. (JA1377.) By contrast, parole officer Pescatore's caseload was 1.8 at that time, and at least eight parole officers had higher caseload ratios than Orsaio. (JA1377.)

In early 2015, Orsaio complained to her supervisor, senior parole officer Randy Blais, that she was overwhelmed by her caseload, but he did not do anything about it. (JA160, 297-298, 1103-1104.) As Blais explained, there "wasn't really much you could do" because "the numbers were the numbers at that point." (JA1104.) Orsaio never complained to Hess about her caseload. (JA298.)

Around March 2015, Orsaio asked Blais to reassign her SIST caseload. (JA298-299.) She conceded that she did not have another position in mind and that there were no other positions available for her

11

at the time. (JA299.) Orsaio claims that Blais told her Hess denied her request. (JA298-299.) Orsaio also asked Ricci for a reassignment of her SIST caseload (JA160, 1035-1036), telling him she felt "burnt out" and "tired of hearing about sex offenders having sex" and their "different perversions and such." (JA1029, 1036-1037.) Orsaio never mentioned any alleged discrimination or harassment from Hess or any other officers in that conversation. (JA305.)

On April 17, 2015, Orsaio emailed Ricci to thank him for "being understanding" about her reassignment request. (JA 1281, 1035-1036.) Her email explained that she made the request "for no other reason" than her years of handling sex offender cases and the toll it was taking on her personal well-being. (JA1281; *see also* JA160.) Ricci offered to post her SIST caseload (JA160, 1281), but Orsaio understood she would have to bid on and win a new caseload assignment before her SIST caseload could be posted (JA299-301).[4]

---

[4] She believed, however, that Hess had prevented her from getting a Herkimer County caseload in January 2015. Although the caseload was awarded to a more senior officer, Orsaio claims Hess convinced the other officer to bid on the caseload when he heard that Orsaio was the only parole officer interested. (JA148, 298-299, 309-310, 312.)

In July 2015, Orsaio bid on a Utica city caseload, even though she did not think it was ideal because it included Spanish-speaking parolees and Orsaio did not speak Spanish. (JA315, 319.) She was awarded the caseload and assumed it promptly. (JA160.) Approximately one month later, Orsaio bid on and was awarded an Otsego County caseload. (JA146, 317, 1233.) She did not immediately assume the Otsego County caseload, however, as Hess directed her to continue with her Utica city caseload until the office had someone else to take that caseload over. (JA1233.)

Thereafter, Hess determined that he did not need another officer for the Otsego County caseload. (JA642, 646.) The caseload had previously been staffed by two parole officers, and Hess had chosen Orsaio to fill one of those two spots. (JA1233.) As Orsaio concedes, however, Hess thereafter realized the caseload in Otsego County had decreased and thus two parole officers were not needed to staff it at the

13

time.[5] (JA320-321.) Orsaio nonetheless claims that Hess was blocking her transfer. (JA146, 320.)[6]

## 2. Orsaio Is Not Permitted to Change Her Assigned Duty Day.

Parole officers generally have some flexibility with their schedules. Once a week, however, they are required to remain in the office from 8:00 a.m. to 6:00 p.m. to meet with the parolees who report to them on a weekly or biweekly basis. (JA149-50, 285, 550, 589-590.) Such days are called "duty" days. (JA149.) Duty days are assigned by senior parole officers and bureau chiefs. (JA149, 590-591.) They do not differ in overtime opportunities or pay. (JA153, 290.) Orsaio claims but offers no evidence that duty days are assigned by the same bidding process as caseload assignments. (JA286-287.) Hess testified that duty days are assigned primarily on the basis of operational need, which includes considerations such as the need to accommodate those parolees who have

---

[5] At that time, the officer who remained in Otsego had a caseload of .69 while the officer leaving had a caseload of .46. (JA645-647.)

[6] Orsaio testified that when she took over the Otsego County caseload in 2017—two months after Hess had retired—she was the only parole officer responsible for the caseload. (JA325, 328.)

arranged their schedules to report on a certain day, and how able the office is to accommodate a given number of parolees reporting on a single day.[7] (JA590, 597-598, 614.)

In August or September 2015, Orsaio asked her supervisor to switch her duty day from Monday to Tuesday. (JA152.) Orsaio heard that a parole officer was being promoted, and she wanted to take his Tuesday duty day. (JA286-287.) She did not ask for the change in writing, nor was there a formal bid for the Tuesday duty day. Orsaio simply asked her supervisor to switch her day when the officer's Tuesday duty day became available. (JA149, 287-288, 613-614.)

The supervisor passed Orsaio's request on to Hess, who denied it. (JA287-288.) To minimize disruption, Hess decided that the parole officer who took over the promoted officer's caseload should assume that officer's duty day. (JA152, 600.) Hess testified that Orsaio had around 49 parolees scheduled to meet with her on Mondays; a change in Orsaio's duty day

---

[7] Senior parole officer Randy Blais corroborated Hess's testimony when he testified that there is "no bidding" and "really no change with duty days." (JA1110-1111.)

would therefore have required all 49 parolees to change their schedules and come to the office a different day. (JA152-153, 601.)[8]

### 3. Orsaio Is Not Selected for a One-Time Overtime Job.

On August 21, 2015, a senior parole officer emailed staff about a one-time overtime opportunity to work a roadblock check with the Utica Police Department. (JA147-148, 1282.) The job was scheduled for four hours. (JA148, 1282.) The email stated that the Utica office wanted to "get two to three officers to participate if possible." (JA1282.) Orsaio applied for the overtime job, along with two parole officers who were senior to her. (JA329-330.) Ultimately the office chose just two officers from Utica for the job, and thus Orsaio was not chosen. (JA329-330.) She believes this was at Hess's direction, though Hess testified he was not involved in the decision. (JA655.)

_____

[8] Although Orsaio notes that other parole officers switched duty days, there were operational needs for switching those days. For example, one officer had just graduated from the academy and switched his duty day to be in the office on the same day as his training officer. (JA153, 611.) Moreover, Orsaio herself had previously had her duty day changed on multiple occasions. (JA613-614.)

16

### 4. Orsaio Is Permitted to Pursue Opportunities for Supplemental Outside Employment but Alleges Undue Interference.

Parole officers are allowed to seek outside employment but must make a formal request and obtain approval from their bureau chief. (JA161, 261.) In September 2015, Orsaio sought outside employment at the Utica City School District to work security at football games. (JA263-265.) Both her senior parole officer and Hess approved her request, but she did not get the position. (JA161, 264, 268.) Orsaio claims she was advised by a school board member that someone from "her agency" called the school and "really put the screws in for [her]," leading the board not to hire her. (JA161, 267-268.) Orsaio has never provided any additional evidence supporting this claim, including, for example, the name of any DOCCS official who made this alleged call, nor did she complain about it at the time. (JA161, 268-269.) Orsaio was, however, subsequently approved to work in a sports bar as a "clerk rep," and did that work for approximately six months. (JA161, 260-261, 270.) Orsaio did not apply for any other outside employment opportunities. (JA148.)

17

## C. DOCCS Awards Orsaio a Requested Position as a Polygraph Examiner, But She Does Not Succeed in the Position.

In September 2015, Orsaio emailed Regional Director Ricci about her interest in becoming a polygraph examiner. (JA1285-1286.) Parolees who are sex offenders are subject to polygraph examinations. (JA889, 1471.) Polygraph examiners are responsible for scheduling and conducting polygraph examinations and preparing and submitting reports of examination results. (JA156.) Orsaio was interviewed for the polygraph position by Hess, senior parole officer Leroy Walker and DOCCS Director of Sex Offender Management Mary Kopp.[9] (JA156, 667-668.) The interviewers advised Orsaio that, as a polygrapher, she would have duties in addition to her polygraph duties. (JA157.) Hess recommended Orsaio as his top choice for the position, and Orsaio was awarded the position. (JA156, 667-668; *see also* JA1290.) The position required Orsaio to obtain training, at State expense, which she did in Maryland from January to March 2016. She returned to the Utica area office on March 21, 2016. (JA347-348, 607, 1291.)

---

[9] Mary Kopp's name sometimes appears as "Mary Adams" in the record.

18

Polygraph examiners are expected to do three examinations per week, in addition to other duties determined by the area office. (JA156, 158, 873, 1313.) They do not have caseloads of parolees to supervise, as other parole officers do. (JA157, 541, 678.) For her additional duties, Orsaio was assigned the preparation of two kinds of reports: Certificate of Relief Reports and Local Conditional Release Reports. (JA156-57, 670-671.) Hess determined that the assignment would complement the polygraph work well, as it was not unduly time consuming, and would also increase office efficiency. (JA675.)

A Certificate of Relief Report is a report on an application made by an individual in the community to recover a privilege lost because of a criminal record. (JA153.) For example, an individual with a criminal record who wishes to become a nurse or own a firearm needs a certificate. (JA751-752; *see also* N.Y. Correct. Law § 701.) To complete a report, a parole officer is assigned to investigate and sometimes interview the applicant. (JA153, 750.) The parole officer then makes a recommendation about whether to grant the requested relief. (JA153.) Hess testified that he has "done at least a hundred [such reports] in 20 years" and that they "never took [him] more than 15 to 20 minutes." (JA686.) Susan Hrovat,

Orsaio's supervisor at the time, testified that the reports take about one to three hours to complete. (JA757.)

Local Conditional Release Reports require parole officers to visit eligible individuals serving qualifying sentences in local custody, explain what local conditional release entails and obtain signed forms from those who wish to pursue such release. (JA156, 361, 683.) It is undisputed that most eligible individuals decline the opportunity for local conditional release.[10] In such cases, the parole officer simply brings a signed declination back to the office. (JA156-57, 361, 674; *see also* JA758.) As it turned out, *all* of the individuals Orsaio approached either declined release or had already been released, and thus were no longer eligible for release. (JA158, 361, 1306-1307, 1565.) When an individual wishes to apply for the program, according to Hrovat, the resulting report takes

---

[10] Local conditional release is governed by New York Penal Law § 70.40(2). It authorizes an individual's release from local custody early, but in accordance with DOCCS's rules, it requires individuals to serve a full year of supervision, regardless of the time remaining on their sentence. Individuals often decline the opportunity because the penalty for violating local conditional release can result in more jail time those individuals otherwise currently face.

just ten minutes to complete (JA757), though Orsaio claims that they are more time consuming (JA360).

The Utica area office had previously rotated the assignment of these reports. Before assigning the reports to Orsaio, Hess spoke with regional director Ricci and Mary Kopp. (JA761.) Hess thought it made sense to assign the reports to polygraphers: Polygraphers are available to perform additional duties. And polygraphers have to travel anyway to conduct their examinations; they therefore can coordinate that travel with scheduled visits to eligible individuals. (JA157, 671, 675.) Ricci and Kopp agreed that giving Orsaio the reports was a "good plan," and the decision was implemented. (JA157, 671, 1305-1306.)

In May 2016, defendant Hrovat became Orsaio's supervisor. (JA142.) Hrovat testified that one of her responsibilities as a senior parole officer was to review Certificate of Relief Reports submitted by the parole officers she supervised before submitting them to Hess for his review. (JA154.) Orsaio acknowledged that it was "probably part of [Hess and Hrovat's] duties" to review her reports but claimed her reports had not been critiqued in the past. (JA358.)

21

On two occasions, Hrovat asked Orsaio to revise her reports. (JA154.) One example of a proposed change included telling Orsaio to "make a recommendation based on the facts." (JA762; 1294.) On June 10, 2016, Orsaio filed a grievance against Hrovat, claiming that Hrovat's revisions were "harassment." (JA1329.) The grievance was denied. (JA1330.) Orsaio filed an administrative appeal, and the agency upheld the decision, determining that these corrections were "well within [Hrovat's] discretion." (JA133)

In total, Orsaio was assigned four Certificate of Relief Report and five Local Conditional Release Reports between March and May 2016. (JA157, 1306.) Although was given over a month to complete each report (JA157, 1306-1307), she complained that she could not complete her polygraph work if she had to do the reports (JA158, 698). She even canceled scheduled polygraph examinations without informing her supervisor. (JA698, 1308.) In light her complaints, Hess reassigned the function of preparing the reports just two months after Orsaio returned from polygraph school and started performing examinations. (JA158, 698-99, 1305-1307.) And he did not thereafter assign Orsaio *any* additional duties. (JA158, 698-699, 1305-1307.)

Nonetheless, Orasio consistently failed to meet the standards and goals for a polygraph examiner. While Hrovat was Orsaio's supervisor during this period, senior parole officer Walker was responsible for monitoring Orsaio's polygraph work. (JA165, 769.) Walker performed "quality control" by reviewing tapes of Orsaio's examinations and providing Orsaio with feedback, including any problems he observed. (JA872-873, 1373.) He relayed that same information to Orsaio's supervisors and sent out quality control reports detailing his observations. (JA166-67, 869; 872-873, 1373.) In addition, Walker worked with Billy Thompson, the Director of Orsaio's polygraph school, who also performed quality control. (JA873.)

Walker and Thompson consistently found that Orsaio was not performing polygraph examinations in accordance with her training. (JA166-167, 1355.) For example, on July 11, 2016, and thus when Orsaio was no longer responsible for any additional duties, Thompson emailed Orsaio directly to advise of a problem with an examination. (JA1339.) She responded that she had not been given sufficient time to do the examination. (JA1339.) A further review of the matter revealed that even though Orsaio's time to complete examinations was not restricted, she

23

was completing them too quickly, approximately 10 to 15 minutes faster than the minimum time required by American Polygraph Association standards. (JA885, 1365.)

On January 19, 2017—by which time Orsaio had been working as a polygrapher for nine months—Thompson again expressed "a lot of concern" about inaccuracies in one of Orsaio's examinations. (JA1371-1372.) He characterized the examination as "unsatisfactory, not at all meeting the minimum professional standards of the polygraph field and training," and one that could "lead to legal problems if challenged." (JA1372.) Even a full year after her training, Walker told Orsaio that he lacked confidence that she could "consistently and accurately implement and score polygraph exams." (JA1373.)

In addition to Orsaio's consistent failure to meet polygraph examination standards, she was also not meeting her target quota for the number of polygraph examinations performed. Walker told Hess that Orsaio "should be completing 3 exams per week." (JA1312.) Indeed, Orsaio's own "polygraph interview productivity schedule" listed a goal of three examinations "per week." (JA1336.) Between March 2016 and June 2016, however, Orsaio averaged only one examination per week. (JA1311,

1336.)[11] Even after Hess reassigned Orsaio's other reporting responsibilities, Orsaio completed only two examinations in two weeks. (JA1311.)

Orsaio subsequently requested to be released from her polygraph position and returned to a non-specialized parole officer caseload. (JA167, 1387.) On June 8, 2017, her request was granted, effective May 18, 2017. (JA167, 1387.) And after Hess retired in September 2017, Orsaio returned to the Utica office.

## D. Orsaio Files an Administrative Discrimination Complaint with New York's Division of Human Rights.

By that time, Orsaio had filed, on May 20, 2016, a discrimination complaint with the New York State Division of Human Rights ("DHR") alleging that defendants Hess and Hrovat subjected her to discrimination and a hostile work environment on the basis of her sexual orientation. (JA179-86.) Orsaio's DHR complaint specifically acknowledged that she

_____

[11] Orsaio claims that five polygraphers did fewer examinations than she did over the course of calendar year 2016. Two of those five retired in 2016. The record contains no information about how any deficiencies in the performance of other polygraphers may have addressed by their respective offices. And Orsaio's class of polygrapher trainees, only one did fewer examinations than she did. (JA1505.)

was "also filing [her] employment claim with" the EEOC and "authorize[d] [DHR] to accept this complaint on behalf of" the EEOC. (JA186.)

On November 10, 2016, the DHR issued a determination after an investigation finding no probable cause to believe that DOCCS engaged in or was engaging in unlawful discrimination. (JA187.) Accordingly, the DHR dismissed the complaint and closed the file. (JA188.)

On December 16, 2016, the United States Equal Opportunity Commission ("EEOC") adopted the DHR's findings and issued a letter dismissing Orasio's complaint and notifying her of her right to pursue a legal action in court, known as a "right-to-sue" letter. (JA189.) Defendant received its copy of the right-to-sue letter four days later, on December 20, 2016. (JA189.) The letter was also accurately addressed to Orsaio. (JA189, 252.) Under well-established precedent, right-to-sue letters are presumed to have been mailed on the date they are addressed, and they are presumed to have been received by an addressee listed within three days of mailing. Orsaio nonetheless failed to commence a lawsuit based on her claims of discrimination and hostile work environment within 90 days of her presumed date of receipt of the right-to-sue letter. Indeed,

Orsaio did not commence this lawsuit until June 23, 2017, over six months later.

### E. Orsaio Thereafter Fails To Provide Adequate Justification for Requested Overtime Reimbursement and Continues to Have Time Management Issues.

Generally, before a parole officer can collect overtime pay, the officer must provide the supervising senior parole officer with information on why the overtime is necessary. (JA148, 817.) If the senior parole officer preapproves the request, the request is forwarded to a bureau chief for final approval. (JA148, 750.) A parole officer cannot collect overtime pay without that approval. (JA148, 815.) Moreover, senior parole officers are required to monitor parole officers' overtime and issue weekly reports on the amount of overtime needed. (JA143, 750-751.)

On May 23, 2016—three days after filing her administrative complaint of discrimination with the DHR, Orsaio sought payment for 2.5 hours of overtime she claimed she worked during the previous pay period. (JA148, 821-822, 1317.) She said the overtime was necessary for a polygraph examination she conducted in St. Lawrence, New York, which required travel and an overnight stay. (JA371-372.) Orsaio testified that she discussed the trip with the supervisor she had before

27

Hrovat's arrival in Utica. (JA371-372.) Orsaio could provide no documentation of preapproval for the overtime request, however, and Hrovat therefore denied it. (JA821-822, 1301.)

Orsaio filed a grievance against Hrovat, claiming that the denial of her overtime request was due to "discriminatory treatment." (JA148, 1317.) The grievance was denied in a decision explaining that there was "no indication that prior supervisor approval was either sought or granted," as required for overtime under DOCCS's Policy and Procedure Manual and DOCCS Directive 2214. (JA1320.) Orsaio administratively appealed, but the grievance denial was upheld. (JA1323.)

On or about June 1, 2016, Hrovat told Orsaio that she requires a call or text from all of her parole officers at beginning and end of their workdays. (JA1324, 1328.) In response, Orsaio filed a second grievance against Hrovat, claiming that Hrovat demonstrated "discriminatory practice of supervision" because Orsaio's "peers" did not have to make these calls. (JA1324.) The grievance was denied, and the denial was upheld on administrative appeal because DOCCS's policy and procedure manual expressly requires parole officers to call their supervisors at

28

specified times, "once in the morning and once in the afternoon." (JA1325-1327) (quoting DOCCS Policy and Procedure Manual Item #9499.02).

On June 10, 2016, Hrovat told Orsaio that she needs to be in the office between the business hours of 8:00 a.m. and 6:00 p.m. (JA793.) Generally, parole officers are allowed staggered work schedules allowing them to start their days before or end their days after normal business hours, provided they submit their schedules to their supervisor. (JA149.) Hrovat testified that because Orsaio was "struggling" with her work, she temporarily required her to work normal business hours so that supervisors would be available to assist her if necessary. (JA781-782.)[12]

In response, Orsaio filed a third grievance, claiming that she had a right to a staggered work schedule and that Hrovat "changed her schedule without her consent." The grievance was denied in a decision finding that Hrovat's request was consistent with the Division of Parole

---

[12] Orsaio claimed that Hrovat asked her to submit daily calendars of her work. (JA1571.) However, Hrovat testified that she only suggested this to Orsaio to help with time management since it "worked for [her]." She also thought it would help her justify overtime expenses. (JA791.) In any event, Orsaio testified that she did not submit the daily calendars to Hrovat. (JA377.)

Manual because it was made to improve productivity and assist with time management. (JA1321.) On Orsaio's administrative appeal, the grievance denial was upheld as consistent with DOCCS's policies. (JA156, 1322-1323, 1327-1328.)

Orsaio does not dispute that, in May and June 2016, Hrovat advised her to use a state vehicle made available for polygraph-related travel and to contact the vehicle coordination officer about the availability of a state vehicle before traveling. (JA167-168.) Indeed, Hrovat advised that this was the best use of state resources. (JA1301, 1312.) Orsaio nonetheless submitted a travel voucher for multiple dates of work-related travel based on expenses incurred from the use of her own vehicle, even though a state vehicle was available on each date of travel, and there was no indication that Orsaio had been advised otherwise. (JA167, 1334-1335.) Her request was therefore denied, and she filed a grievance; this time, her grievance was denied only in part—she was approved for reimbursement only for travel between home and office.[13] (JA1334-1335.) Orasio would later argue (ECF No. 33-6 at 32) that the issue arose only

_____

[13] Because Orsaio had to report to work to pick up a state vehicle, she was reimbursed for that local travel. (JA380-384.)

because she was never assigned a designated state vehicle, to which she believed she was entitled upon assuming polygraph duties.

In spring 2016, Hrovat was also counseling Orsaio about her time management skills. For purposes of illustrating how some interviews take longer than others, Hrovat she relayed a story about an interview with a transgender person, which ended up taking longer than she expected because of the person's interesting perspective. (JA151.) Hrovat shared the anecdote to assure Orsaio that if some interviews are taking longer than usual, she can ask Hrovat for assistance. (JA151.)

Also around this time, Orsaio came into the office while on sick leave to pick up some food she had left in her desk. (JA431.) When Hrovat asked why Orsaio was in the office while on sick leave, Orsaio allegedly told her it "because of this place," "what you and Hess are doing," and the fact that Hrovat was essentially Hess's "henchman." (JA431.) Orsaio alleges that Hrovat responded by calling her "the worst, despicable worker" that she ever met, her work is "poor," and she would be lucky to have a job in a year. (JA431-432.) When Orsaio asked if Hrovat was threatening her, Hrovat asked her to leave. (JA432.)

**F. Orsaio Receives a Critical Performance Evaluation.**

Performance evaluations are completed by a parole officer's immediate supervisor and then signed off on by the bureau chief. (JA164, 500, 824.) On July 8, 2016, Orsaio received an unsatisfactory performance evaluation authored by Hrovat.[14] (JA164, 1337.) Hrovat testified that the performance evaluation was based in part on conversations with Walker (Orsaio's polygraph supervisor) and a senior parole officer. (JA164, 824.) The evaluation described, among other things, Orsaio's deficient polygraph examinations, inability to complete the expected number of polygraph examinations, her failure to seek prior approval for overtime, and also the frequent and sudden sick leave. (JA1337.)

Orsaio appealed the evaluation, and it was subsequently changed to satisfactory. (JA164.) Because the evaluation was changed to satisfactory, it will not impact her ability to receive longevity pay. (JA164-165.)

---

[14] Although Orsaio had previously received positive evaluations, this was her first evaluation as a polygrapher.

32

### G. Orsaio Files a Second Administrative Complaint with the New York's Division of Human Rights, this Time Alleging Retaliation.

On August 5, 2016, Orsaio filed a second complaint with DHR, this time alleging that defendants Hess and Hrovat retaliated against her for filing her prior discrimination complaint by giving her a negative performance evaluation. (JA192-201.) After an investigation, DHR determined on January 26, 2017, that the evidence provided probable cause to believe DOCCS engaged in retaliation and recommended the matter for a hearing before an assigned administrative law judge. (JA202, 218.) No such hearing was convened, however; on February 17, 2017, Orsaio requested a dismissal of the retaliation complaint for administrative convenience so that she could commence a federal action for retaliation, and her request was granted. (ECF No. 1-2, Ex. B.) Thereafter, Orsaio received a right-to-sue letter from the EEOC dated May 2, 2017 (ECF No. 9-1, Ex. A), and she commenced the underlying case within 90 days of receipt of that letter, on June 23, 2017 (ECF No. 1).

33

## H. Orsaio Alleges Ongoing Hostility After Her Second Administrative Complaint.

Orsaio had earlier requested to transfer from the Utica office to the Syracuse office. (JA151.) Her request was initially denied based on operational needs, but it was granted in September 2016. (JA151.) On September 27, 2016, Orsaio received a counseling memorandum from her Syracuse bureau chief, *i.e.,* not Hess, regarding "recent incidents of concern" in which she "violated agency policy or supervisory direction." (JA1349.)

On January 11, 2017, Walker issued Orsaio a second counseling memorandum regarding her polygraph examinations. (JA1368.) Walker indicated that he met with Orsaio "on several occasions" to review her errors and "explain[ed] the correct way to implement the examination and chart scoring." (JA1368.) However, his corrective action had "little impact" on Orsaio as she "continue[d] to make the same errors" and her "overall performance remain[ed] less than satisfactory." (JA1368.) Instead of "acknowledging" her mistakes, Orsaio "indicated that [she was] 'stressed out'" and "would like to return to being a Field Parole Officer." (JA1368.)

34

In 2017, by which time Hess had retired, Orsaio returned to the Utica area office.

## I.   Orsaio Commences this Litigation and the District Court Issues the Decisions Challenged on Appeal.

Orsaio brought this action in the United States District Court for the Northern District of New York on June 23, 2017, alleging that defendants discriminated against her on the basis of sexual orientation, created a hostile work environment, and retaliated against her, in violation of Title VII.[15] (JA105.)

Although her complaint was filed within 90 days of the EEOC's May 2017 right-to-sue letter for her retaliation claim, it was filed over six months after the EEOC's December 2016 right-to-sue letter for her discrimination and hostile work environment claims. (ECF No. 8-4 at 1-2.) Accordingly, defendants moved to dismiss the latter two claims as

_____

[15] Orsaio additionally sought to assert the same claims under the New York State Human Rights Law, New York Executive Law §§ 290–301, as well as claims against individual DOCCS officials under Title VII and 42 U.S.C. § 1983. Because she does not challenge the dismissal of those claims in her brief to the Court, she has abandoned any such challenge. *LoSacco v. City of Middleton*, 71 F.3d 88, 92 (2d Cir. 1995). Accordingly, we do not discuss those claims further here.

35

untimely. (ECF No. 8.) In opposition, Orsaio filed an affidavit claiming that she was "confident" she did not receive the December 2016 right-to-sue letter and learned of it only when her counsel received copies of both right-to-sue letters on June 1, 2017. (ECF No. 9-1, ¶¶ 4, 8.) The district court denied the motion as "premature," but stated that the parties could "renew their timeliness arguments at the summary judgment stage." (ECF No. 13 at 13.)

After discovery, defendants moved for summary judgment. The court granted the motion in part; it dismissed Orsaio's claims of sex discrimination and hostile work environment but denied summary judgment on her retaliation claim, which proceeded to trial. (JA18-72.)

The district court held that Orsaio's discrimination and hostile work environment claims were untimely because they were asserted in a DHR complaint filed more than 90 days after the EEOC's right-to-sue letter that authorized them. (JA51-52.) The court reasoned that Orsaio failed to rebut the presumptions of mailing and receipt because she merely denied receipt and did not "describe any circumstances from which the Court could reasonably infer nonreceipt (or delayed receipt), such as a change of residence or other mail delivery issues." (JA51-52.)

36

Although the district court found Orsaio's sex discrimination and hostile work environment claims untimely, it nevertheless analyzed the merits of those claims and determined that Orsaio had failed to raise a triable issue of fact as to either one. (JA54-65.) For this purpose, the court held that three alleged events could not be used to establish a sex discrimination claim because they were alleged to have occurred more than 300 days before the December 2016 DHR complaint: (1) the disproportionate increase in her caseload "towards the end of 2014, beginning of 2015"; (2) the denial of her request in the beginning of 2015 to be removed from her SIST caseload; and (3) an alleged action that preventing her from transferring to the Herkimer County caseload in January 2015 (JA54-55). *See supra,* at 12 n.4. The court held that these allegations could not be used to establish a hostile work environment claim either, because they constituted allegations of discrete discriminatory acts, distinct from those typically associated with hostile work environment claims, and Orsaio could not "piggyback" these allegations onto a hostile work environment claim to make them actionable. (JA54.)

37

The court held further that evidence of the remaining allegations of seemingly unfavorable workplace decisions was insufficient to warrant a trial on Orsaio's sex discrimination claim. The court reasoned that Orsaio failed to establish that some of those decisions constituted adverse employment actions sufficient to support a discrimination claim—noting that Orsaio had even abandoned an argument to the contrary for some of them[16]—and that she failed in any event to present evidence sufficient to permit an inference of discrimination. (JA55-61.)

Turning to Orsaio's hostile work environment claim, the district reasoned that Orsaio could not rely on even the timely allegations of workplace decisions on which she based her discrimination. Because the evidence was insufficient to suggest that those decisions were discriminatory, *i.e.* made on the basis of sex, they were not relevant to Orsaio's hostile work environment claim. And the court reasoned that the

---

[16] The court held that Orsaio abandoned sex discrimination claims based on five allegations by failing to respond to defendants' argument that she did not suffer any adverse employment action. These were her allegations that Hess (1) delayed her transfer to the Otsego County caseload; (2) denied her request to switch her duty day; (3) denied her a one-time overtime opportunity; (4) interfered with her effort to pursue an opportunity for part-time outside employment; and (5) together with Hrovat, excessively monitored and scrutinized her work. (JA57 n.34.)

38

remaining allegations of hostility, even if motivated by discriminatory animus, were insufficient to suggest a hostile work environment because they were not sufficiently severe or persuasive. (JA64-65.)

Before the retaliation claim proceeded to trial, the parties submitted motions *in limine* regarding the scope of evidence that would be admissible at trial. Among other things, defendants moved to preclude evidence regarding Orsaio's dismissed discrimination and hostile work environment claims. (JA1601.) After briefing and oral argument, the district court granted defendants' motion in part and reserved certain evidentiary issues for trial. (JA73-102.)

The district court ruled that Orsaio could offer "as background evidence" facts "underlying her belief that Hess learned of her sexual orientation in 2014, after which his behavior toward her allegedly changed, as well as the background and environment that led to her protected activity." (JA79.) The court ruled that Orsaio could also testify as to "a general statement of the nature of the claims asserted in her May 2016 DHR Complaint, which is the protected activity that forms the basis of her retaliation claim." (JA80.) The district court reserved for trial the question whether the DHR complaint itself could be admitted and

cautioned that evidence "to *prove or corroborate* the discriminatory acts alleged in the DHR Complaint is likely inadmissible on the ground that any minimal probative value is substantially outweighed by the danger of confusing discrimination, which need not be proved, with retaliation, the claim at issue." (JA80-81.) (Emphasis added.) And the district court precluded as inadmissible hearsay evidence of an alleged vulgar statement made to Orsaio by a coworker explaining why Hess did not like her. (JA86-87.)

The court ultimately precluded the admission of the May 2016 DHR retaliation complaint as well as certain trial exhibits on finding that any probative value they could offer was outweighed by the prejudice their admission would cause. (JA2126, 2129-2131, 2134-2136.) Further, the court observed that there were "several kinds of hearsay references in the complaint" and noted that Orsaio would be allowed to testify as to the basis of her complaint and why she filed it. (JA2126.) And the court reasonably exercised its discretion by precluding as unduly prejudicial evidence identified for the first time just two weeks before trial was scheduled. Orsaio sought to supplement her damages evidence by arguing that, because of her negative performance evaluation in 2016,

she was denied promotional opportunities not just in 2019, but also as recently as 2021. (JA2105, 2113, 2141-2142.)

On February 23, 2022, the jury returned a verdict finding that Orsaio did not prove her retaliation claim. (JA2150.) This appeal followed.

## STANDARD OF REVIEW

"This Court reviews summary judgment decisions *de novo*, viewing the record in the light most favorable to the non-moving party." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (quotation marks omitted); *see* Fed. R. Civ. P. 56(a). A plaintiff claiming discrimination cannot withstand summary judgment through mere "speculation and conjecture." *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 75 (2d Cir. 2005) (quotation marks omitted). Rather, she must adduce "hard evidence showing that [her] version of the events is not wholly fanciful." *Miner v. Clinton County*, 541 F.3d 464, 471 (2d Cir. 2008) (quotation marks omitted). Indeed, "trial courts should not 'treat discrimination differently from other ultimate questions of fact.'" *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000)).

41

This Court reviews a district court's evidentiary rulings under a deferential abuse of discretion standard and disturbs an evidentiary ruling only where the decision to admit or exclude evidence was manifestly erroneous. *United States v. McGinn*, 787 F.3d 116, 127 (2d Cir. 2015).

## SUMMARY OF ARGUMENT

The district court correctly granted DOCCS summary judgment dismissing Orsaio's sex discrimination and hostile work environment claims, for either of two reasons.

First, Orsaio failed to file suit for those claims within 90 days of receiving a right-to-sue letter on her December 2016 DHR complaint asserting them. Instead, she did not file suit until over six months later, after her counsel received copies of *both* of her right-to-sue letters.

Second, she failed to raise a triable issue of fact with respect to either of those claims. Some of her allegations related events occurring more than 300 days before the filing of her DHR complaint and were thus time-barred, and some did not involve events that constituted adverse employment actions at all. Regardless, Orsaio's attempt to establish her discrimination claim by challenging a series of workplace decisions failed

42

because, in response to DOCCS's evidence that the subject decisions were justified by legitimate operational needs, she failed to present evidence sufficient to suggest pretext. And because there was insufficient evidence to suggest that the subject decisions were discriminatory, the district court properly declined to consider them for purposes of Orasio's hostile work environment claim. Instead, that claim reduced to a series of incidents and statements that, while perhaps unprofessional or even vulgar, were not sufficiently severe or pervasive to warrant a trial.

As for Orsaio's retaliation claim, the district court acted well within its discretion in admitting only so much of Orsaio's proffered evidence as was necessary to establish her belief that her administrative complaint of discrimination and hostile work environment were well founded. The court, however, reasonably precluded Orsaio from using her retaliation claim to put before the jury all evidence arguably relevant to the sex discrimination and hostile work environment claims that had been rejected at the summary judgment stage.

43

# ARGUMENT

## POINT I

### THE DISTRICT COURT PROPERLY GRANTED SUMMARY JUDGMENT REJECTING THE SEX DISCRIMINATION AND HOSTILE WORK ENVIRONMENT CLAIMS

**A. The District Court Properly Rejected as Untimely Orsaio's Sex Discrimination and Hostile Work Environment Claims.**

"In order to be timely, a claim under Title VII . . . must be filed within 90 days of the claimant's receipt of a right-to-sue letter." *Sherlock v. Montefiore Med. Ctr.*, 84 F.3d 522, 525-26 (2d Cir. 1996). This Court presumes that notice provided by a government agency was mailed on the date shown on the notice. *Id.* at 526. The Court further presumes that a mailed document is received within three days of mailing. *Id.* (citing *Baldwin Cnty. Welcome Ctr. v. Brown*, 466 U.S. 147, 148 & n. 1 (1984)). A litigant may rebut these presumptions only upon "present[ing] sworn testimony or other admissible evidence from which it could reasonably be inferred either that the notice was mailed later than its typewritten date or that it took longer than three days to reach her by mail." *Id.*

The EEOC's right-to-sue letter for Orsaio's May 2016 DHR complaint is dated December 16, 2016, and it is addressed to Orsaio at her correct address, and also to DOCCS. (JA189.) It is therefore

44

presumed that the EEOC mailed the right-to-sue letter to Orsaio on December 16, 2016, and that Orsaio received the letter within three days. Because December 19, 2016, was a Sunday, the letter is presumed to have been received by Monday, December 20, 2016. Indeed, DOCCS received its copy of the letter that very day. (*See* JA189.) Yet Orsaio did not file the underlying federal complaint until June 23, 2017, over six months later, and thus well beyond the 90-day limitations period.

Orsaio sought to rebut the presumptions of mailing and receipt with an affidavit stating that she is "confident" she did not receive the right-to-sue letter in December 2016, along with proof that copies of both right-to-sue letters were received by her counsel on June 1, 2017. (Br. at 26; *see also* ECF No. 9-1.) That evidence was insufficient to rebut the presumptions.

This Court has squarely held that, absent evidence that a litigant's counsel "request[ed] service *in lieu of* service on the claimant," a counsel's later receipt of a right-to-sue letter "does not affect, much less vitiate, the operative presumptions regarding the receipt of an EEOC right-to-sue letter by the claimant herself." *See Tiberio v. Allergy Asthma Immunology of Rochester*, 664 F.3d 35, 37-38 (2d Cir. 2011) (emphasis added). Thus,

45

counsel's later receipt of the December 16, 2016, right-to-sue letter does not rebut the operative presumptions, and Orsaio presented no proof that her counsel requested service on counsel in lieu of service on herself.

That leaves Orsaio's denial of receipt. As the district court properly held, Orsaio's affidavit "does not describe any circumstances from which the Court could reasonably infer nonreceipt (or delayed receipt), such as a change of residence or other mail delivery issues." (JA52.) And this Court has held that "mere denial of receipt" does not rebut the presumptions of mailing and receipt. *Isaacson v. New York Organ Donor Network*, 405 F. App'x 552 (2d Cir. 2011) (summary order). Orsaio therefore failed to rebut those presumptions, and the district court properly held that her claims of discrimination and hostile work environment were time-barred.

## B. Plaintiff Failed In Any Event to Present Evidence Sufficient to Warrant a Trial on Her Discrimination Claim.

Although the Court should affirm the district court's grant of summary judgment on Orsaio's discrimination and hostile work environment claims based on her failure timely to commence litigation asserting those claims, the Court may also affirm the district court's

46

alternative holding that Orsaio failed to present evidence sufficient to warrant a trial on those claims.

Preliminarily, Orasio does not challenge on appeal the district court's rejection of her discrimination claim alleging that Hess disproportionately increased her caseload toward the end of 2014 or the beginning of 2015.[17] Nor could she, given that the claim was based on conduct alleged to have occurred more than 300 days before she filed an administrative complaint with DHR asserting that claim. "As a precondition to filing a Title VII claim in federal court, a plaintiff must first pursue available administrative remedies and file a timely complaint with the EEOC." *Hardaway v. Hartford Pub. Works Dep't*, 879 F.3d 486, 489 (2d Cir. 2018) (internal quotation omitted); *see also* 42 U.S.C. § 2000e-5(e), (f). And Title VII requires that individuals aggrieved by acts of discrimination file a charge with the EEOC within "300 days 'after the alleged unlawful employment practice occurred.'" *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 78-79 (2d Cir. 2015) (quoting 42 U.S.C. § 2000e-5[e][1]). Orsaio filed her complaint of

---

[17] Rather, Orsaio claims that the court may consider this allegation "when assessing plaintiff's hostile work environment claim." (Br. at 28.)

discrimination with DHR on May 20, 2016, a filing that also served as an EEOC filing. (JA186.) Allegations of events more than 300 days before that date, *i.e.,* before July 25, 2015, were therefore time-barred. And because Orsaio alleged that Hess disproportionately increased her caseload toward the end of 2014 or the beginning of 2015, a discrimination claim based on that allegation was beyond the 300-day limitations period and was therefore time-barred.

Additionally, the district court correctly found that Orsaio abandoned several of her discrimination claims based on allegations within the 300-day period. As noted, *supra* at 38 n.16, these were her allegations that Hess: (1) delayed her transfer to the Otsego County caseload; (2) denied her request to switch her duty day; (3) denied her a one-time overtime opportunity; (4) interfered with her effort to pursue an opportunity for part-time outside employment; and (5) together with Hrovat, excessively monitored and scrutinized her work. (JA57 n.34.) When a counseled non-moving party submits "a partial response arguing that summary judgment should be denied as to some claims while not mentioning others," that response "may be deemed an abandonment of the unmentioned claims." *Jackson v. Federal Express*, 766 F.3d 189, 195

(2d Cir. 2014). In its summary judgment motion, defendant argued that summary judgment was appropriate as to these five claims because, among other things, none constituted an adverse employment action. (ECF No. 30-2 at 16-27.) In opposing defendant's motion, Orsaio did not defend any of these claims. (ECF No. 33-6 at 31-32.) She also makes no argument as to them on appeal, and instead simply includes them in a chart that purports to identify evidence supporting them. That kind of conclusory reference is insufficient to preserve them for appeal. *See Cuoco v. Moritsugu*, 222 F.3d 99, 112 n.4 (2d Cir. 2000) (noting a "single, conclusory, one-sentence argument is insufficient to preserve any issue for appellate review").

Even if these discrimination claims were timely and preserved, Orsaio still failed to present evidence sufficient to raise a question of fact warranting a trial on *any* of them.

Discrimination claims are analyzed using the familiar burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). A plaintiff first must establish a prima facie case of discrimination on the basis of a protected status with a demonstration that "(1) she was within the protected class; (2) she was qualified for the

49

position; (3) she was subject to an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination." *Liebowitz v. Cornell Univ.*, 584 F.3d 487, 498 (2d Cir. 2009). If the plaintiff establishes a prima facie case, "the burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason for the adverse employment action." *United States v. Brennan*, 650 F.3d 65, 93 (2d. Cir. 2011) (internal quotation marks omitted). And if the employer carries that burden, "the plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination." *Feingold v. New York*, 366 F.3d 138, 152 (2d Cir. 2004).

Many of the decisions about which Orsaio complains do not constitute adverse employment actions, and thus Orsaio failed to establish a prima facie case as to them. An adverse employment action is a material adverse change in the terms or conditions of employment, such as a demotion, reduction in wages, loss of benefits, or significantly diminished responsibilities. *See Vega*, 801 F.3d at 85. Orasio failed to establish an adverse employment action as to her claims that DOCCS:

50

delayed her transfer to the Otsego County caseload after having just recently granted her request to transfer from a SIST caseload to a Utica city caseload; denied her request to change her duty day from Monday to Tuesday; did not select her for a single, four-hour overtime opportunity; did not provide her an "assigned" state vehicle, but told her instead a state vehicle was available when needed; and chose as her duties additional to those of a polygraph examiner responsibility for preparing certain reports. None of these alleged decisions rise to the level of adverse employment actions. Indeed, because polygraph examiners are required to assume additional duties based on the office's needs (JA570, 572, 873, 1155), the decision to assign reporting responsibilities to fill those additional duties was not adverse at all.

In any event, Orsaio failed as to *all* of the discriminatory decisions she challenges to counter DOCCS's evidence of legitimate business reasons for the decisions with evidence of pretext. Instead, she continued to rely on the alleged inference of discriminatory animus she asked the court to draw from her perception that, once Hess learned she was gay, his behavior changed and she was subjected to scattered instances of

unprofessional or rude treatment by others in the office.[18] Even if such an inference were sufficient for purposes of establishing a prima facie case, however, it was not sufficient to rebut DOCCS's evidence of its legitimate business reasons for the decisions challenged.

For example, and as discussed in more detail in the background section above, DOCCS produced evidence establishing that parole officers' caseloads routinely exceed the goal of 1.0 because DOCCS cannot control the number of parolees released to the region served by its various offices, the number of parolees supervised by its various offices, who will violate their parole or finish their parole term in any given month, or the factors that determine the weighted values assigned to the parolees supervised by its various offices. (JA159, 990. 993, 1376.) Indeed, Orsaio conceded that caseloads "fluctuate." (JA323.)

---

[18] As discussed in Point I-C *infra,* Orsaio included among these allegedly offensive incidents a reference Hrovat allegedly made to a transgender individual she once interviewed while counseling Orsaio on time management issues. Even if Orsaio was offended by this anecdote, however, no reasonable juror could find the incident so offensive as to impute an anti-gay animus to Hrovat.

Similarly, DOCCS produced evidence establishing that it reasonably denied Orsaio's request to change her duty day in order to minimize disruption, including for Orsaio's 49 assigned parolees, who would have been required to change their schedules to accommodate the request of a single parole officer. (JA152-153, 600-602.) DOCCS produced evidence establishing that all polygraph examiners are required to assume additional duties and that the decision to assign Orsaio the preparation of certain reports was a "good plan" based on operational need. (JA157, 671, 675.) DOCCS produced evidence that its overtime policy required employees to obtain preapproval for overtime, which Orsaio had failed to obtain. And DOCCS produced evidence that Orsaio was told she should request a state vehicle before using her own for her work travel, as the best use of state resources. (JA1301, 1312.)[19]

---

[19] While Orsaio maintained (ECF No. 33-6 at 32) that she was entitled to a designated, take-home, state vehicle, and thus that the failure to provide her with one was itself another discriminatory decision, the only evidence she submitted to support her claim of entitlement was hearsay. (JA380-384.) She therefore failed to present sufficient evidence to send any such discrimination claim to trial. Indeed, her brief to this Court fails to preserve an argument to the contrary because it references the issue in only the most conclusory terms (*see* Br. at 38).

53

Additionally, DOCCS produced evidence establishing that, as Orsaio faltered in her new role as a polygraph examiner, it worked to help her succeed, first by relieving her of her additional report-making duties within just two months of assigning them—even though polygraph examiners are required to assume additional duties—and then by monitoring her examination results, providing regular feedback and seeking to assist her with her time management skills. (JA799-801, 872-873.) Nine months after Orsaio assumed her position as a polygraph examiner, however, her examination results failed to meet the minimum professional standards of the polygraph field and training. (JA1372.) Even after a year in that position, her supervisors lacked confidence that she could "consistently and accurately implement and score polygraph exams." (JA1373.)

Yet Orsaio seeks to portray that the very steps DOCCS took to help her address her work deficiencies as additional acts of discrimination (Br. at 38.). The record does not support that portrayal. Given the difficulty Orsaio was having accurately completing polygraph examinations, even with no additional duties, DOCCS had legitimate reasons to counsel her on time management and decline her request for a staggered workday so

her work could be supervised throughout the day. (JA156, JA799-801, 1322-1323, 1327-1328.)

As to all of these decisions, then, DOCCS met its burden to produce evidence of legitimate business reasons for these workplace decisions, and the burden thus shifted back to Orsaio to overcome that evidence with evidence of pretext. Orsaio failed to satisfy that burden. She offered no evidence refuting the business reasons DOCCS provided for its decisions. Instead, she relied on the very inference of discriminatory animus on which she relied for purposes of establishing her prime facie case. That was insufficient. While Orsaio sought to rely on two additional pieces of evidence, neither was sufficient, either.

As to Orsaio's "lost" outside employment opportunity at the Utica City School District, Orsaio admits that she does not know who allegedly called the school board, and Hess specifically approved her for that position. (JA161, 266-270.) Thus, other than her speculation, Orsaio failed to provide any evidence that any DOCCS official was in fact responsible for the alleged phone call.

**C. Plaintiff Similarly Failed to Present Evidence Sufficient to Warrant a Trial on Her Hostile Work Environment Claim.**

To prevail on a hostile work environment claim under Title VII, a plaintiff must show (1) harassment that was sufficiently severe or pervasive to alter the conditions of her employment, creating an abusive working environment, and (2) a sufficient basis for imputing the conduct that created the hostile environment to her employer. *Ferris v. Delta Air Lines, Inc.*, 277 F.3d 128, 136 (2d Cir. 2001). *See generally Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (explaining that a hostile work environment is one so "permeated with discriminatory intimidation, ridicule, and insult," it alters the conditions of the victim's employment) (internal quotation marks omitted).

As to the first prong, a plaintiff must show not only that she subjectively perceived the environment to be abusive, but also that the environment was objectively hostile and abusive. *Demoret v. Zegarelli*, 451 F.3d 140, 149 (2d Cir. 2006). Where, as here, no single incident is "extraordinarily severe," a plaintiff must establish that the harassment occurred "with a regularity that can reasonably be termed pervasive." *Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 724 (2d Cir.

56

2010). To that end, "ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing" are not sufficient to establish a hostile work environment. *Faragher v. City of Boca Raton*, 524 U.S. 775, 778 (1998); *see also Schwapp v. Town of Avon*, 118 F.3d 106, 110-11 (2d Cir. 1997).

As to the second prong—imputing the hostile work environment to the employer—a plaintiff cannot rely upon statements made by coworkers unless she can show that the employer "either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it." *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 715 (2d Cir. 1996).

Finally, mistreatment at work, whether through subjection to a hostile environment or through other means, is actionable under Title VII only when it occurs because of an employee's protected characteristic." *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001) (emphasis added); *see also Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002). Thus, facially neutral incidents that are not motivated by discriminatory animus are not relevant to a hostile work environment claim. As this Court has explained:

57

> Everyone can be characterized by sex, race, ethnicity, or (real or perceived) disability; and many bosses are harsh, unjust, and rude. It is therefore important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage or correlation to the claimed ground of discrimination. Otherwise, the federal courts will become a court of personnel appeals.

*Alfano*, 294 F.3d at 377.

Applying these principles, the district court correctly found that Orsaio did not raise a question of fact sufficient to warrant a trial on her hostile work environment claim. To begin, and as demonstrated in Point I-B *supra,* many of Orsaio's allegations constituted "discrete discriminatory acts" for which she failed to provide evidence sufficient to rebut DOCCS's legitimate business reasons for its decisions. There is, thus, no basis to infer that those decisions, however unfavorable to her, were made on the basis of a protected characteristic, and they cannot be relied upon for purposing of establishing a hostile work environment. And to the extent Orasio seeks to rely on the allegedly discriminatory interference with an opportunity for outside employment or an allegedly discriminatory refusal to provide her with a take-home state vehicle to which she believed she was entitled, those allegations were also properly excluded from considered for purposes of her hostile work environment

58

claim. For her allegation of alleged interference with an employment opportunity, she failed, as demonstrated *supra* at 55, to provide evidence sufficient to suggest that anyone at DOCCS in fact interfered as alleged. And for her allegation that she was denied a designated take-home state vehicle to which was entitled, she failed to preserve any such claim for this appeal, *see supra* at 53 n.19, and in any event, and as demonstrated *supra* at 53 n.19 to provide evidence in admissible form to support her claim that she in fact had any such entitlement.

That left allegations of the eight incidents that the district court listed, incidents that the district court correctly held were insufficient, even considered in the aggregate, to rise to the level of hostile work environment. More specifically, Orsaio provided evidence that (1) Hess stopped talking and began to ostracize her after purportedly learning of her sexual orientation after September 2014 (JA334-335); (2) Hess "ignored" her, gave her "filthy looks," called her a "douche bag," and once mimicked the way she walked (JA1568); (3) when she complained that she was not being treating fairly, Hrovat responded that "fair is where you go on rides and eat cotton candy" (JA412); (4) in June 2016, Hrovat told Orsaio that her work was "so poor," that she was a "despicable

worker," and that she would be lucky to have a job the next year (JA431-432); (5) in October 2015, Orsaio discovered a defaced photograph of her on an office bulletin board with a goatee and mustache drawn on her face (340-342); (6) one of Orsaio's coworkers told her Hess does not like her because she does not "like cock" (JA283); (7) on one occasion a coworker asked her why she was not wearing a tie (JA455-456); and (8) Hrovat used a "transgender anecdote" to "lecture plaintiff on time management" around May 2016 (JA458).

Even if Orsaio found the "transgender anecdote" offensive, no reasonable juror could have viewed it as such. In counseling Orsaio on time management, Hrovat was simply explaining that some interviews understandably take longer than others. For that purpose, she explained that she herself had taken a longer time to interview a transgender person because their story was especially interesting. (JA151, 801.) There was nothing offensive in that statement.

In any event, even viewing all eight allegations in the light most favorable to Orsaio, they do not suggest a workplace "permeated with discriminatory intimidation, ridicule, and insult" so "severe and pervasive" that it alters the terms and conditions of her employment.

*Harris*, 510 U.S. at 21 (internal quotation marks omitted). To be sure, they include unprofessional and even vulgar comments. It is well settled, however, that sporadic, isolated incidents of boorish conduct or offensive language are insufficient to establish a hostile work environment. *See Alfano*, 294 F.3d at 381; *Shwapp v. Town of Avon*, 118 F.3d 106, 110-11 (2d Cir. 1997); *Kotcher v. Rosa & Sullivan Appliance Ctr.*, 957 F.2d 59, 62 (2d Cir. 1992).

Contrary to Orsaio's argument (Br. 30-41), the district court did not "accept[] any plausible explanation offered by defendants" or fail to look at the evidence at as a whole (Br. at 33-34.). Indeed, the district court's detailed recitation of the evidence in its 29-page statement of facts demonstrates how carefully it reviewed the large amount of documentation produced in this case and the context of Orsaio's allegations in coming to its conclusions.[20]

---

[20] Plaintiff goes so far as to state (Br. at 42) that the district court "ignored" five of the very eight allegations that its summary judgment decision listed for purposes of analyzing her hostile work environment claim.

61

Orsaio misplaces her reliance on the First Circuit's decision in *Rivera-Rivera v. Medina & Medina, Inc.*, 898 F.3d 77, 92 (1st Cir. 2018). That case involved evidence that, "on a daily or near daily basis," the plaintiff was subjected to "abusive comments about her age," was told her age made her "useless" and "worthless," was excoriated for being "old" and "slow," and was told she should seek out social security benefits and resign before getting terminated because her age interfered with the functions and duties of her job. *Rivera*, 898 F.3d at 91-92. The allegations on which Orsaio relies are nowhere near as severe or pervasive.

Orsaio additional seeks to rely for the first time in her brief to the Court on additional allegations described in the record but not before relied upon as evidence of hostility based on discriminatory animus. *Compare* Br. at 41-44 *with* ECF No. 33-6 at 23-30. Those allegations should thus not be considered here. *See United States v. Stillwell*, 986 F.3d 196, 200 (2d Cir. 2021). In any event, the subject allegations are not even objectively offensive. For example, when Regional Director Ricci decided not to transfer Orsaio immediately to Syracuse, he cited operational needs: Orsaio was the only polygrapher in the Utica area office and needed to be centrally located in the Utica office. (JA1298-

1299.) Additionally, Hrovat's requirement that Orsaio work during normal business hours and call at the beginning and end of her shift were part of Hrovat's responsibilities as Orsaio's supervisor and were consistent with DOCCS's policies and procedures. (*See* JA1317-1328.) Orsaio may have disliked these decisions, but that didn't make them actionable under Title VII.

## POINT II

### THE DISTRICT COURT'S EVIDENTIARY DECISIONS WERE NOT AN ABUSE OF DISCRETION

For Orsaio's trial on her retaliation claim, the district court acted well within its discretion when it permitted the admission of some but not all of Orsaio's proffered evidence of alleged discrimination and hostile work environment. The court's rulings are unassailable and provide no basis to disturb the jury verdict.

To establish retaliation in violation of Title VII, a plaintiff must show that (1) she participated in a protected activity; (2) the defendant knew of the protected activity; (3) she suffered an adverse employment action; and (4) such action was causally connected to her protected activity. *Lenzi v. Systemax, Inc.,* 944, F.3d 97, 112 (2d Cir. 2019). This Court has explained that "[a]n employee's complaint may qualify as

protected activity, satisfying the first element of this test, so long as the employee" has a "good faith, reasonable belief that [she] was opposing an employment practice made unlawful by Title VII." *Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013) (internal quotations omitted). Further, to establish the requisite causation, a plaintiff must show that retaliation was the but-for cause of—rather than simply a substantial or motivating factor in—the adverse employment action. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013).

As the district court duly noted (JA76-77), the parties agreed that Orsaio satisfied the first two elements of her claim: she engaged in protected activity when she filed the DHR complaint in May 216 and DOCCS knew about the filing. (ECF No. 74) The court nonetheless permitted Orsaio to introduce some evidence of her good-faith reasonable belief as background evidence of the circumstances leading to her DHR complaint. The court thus did not make "blanket evidentiary exclusions," as Orsaio argues (Br. at 46), but rather sought to strike an appropriate balance because it properly recognized that allowing Orsaio to present all of her evidence supporting her discrimination and hostile work

64

environment claims—claims the court properly rejected at the summary judgment stage—would unnecessarily confuse the jury, prejudice the defendant and extend the trial.

Orsaio nonetheless argues (Br. at 45-55) that she was entitled to present more complete evidence, not simply for purposes of establishing her good-faith reasonable belief that she was complaining about unlawful discrimination, but for purposes of establishing the requisite causation— that defendant retaliated against her for filing a DHR complaint. She is mistaken. The district court allowed Orsaio to describe her discrimination claims, including what she understood DOCCS's policies to be and why she thought she was treated disparately. The court, however, reasonably preluded additional corroborating evidence.

For example, Orsaio's brief to the Court singles out the court's preclusion of trial exhibits 29 and 17 (Br. at 53-55). Exhibit 29 includes caseload distribution sheets for the Utica office from July 2015,[21] which

---

[21] Plaintiff erroneously identifies Exhibit 29 as a depiction of caseload distributions in July 2016, rather than July 2015. (JA2134-2138.) And Orsaio was, in fact, challenging Hess's allegedly disproportionate caseload assignments in July 2015, not July 2016, as her brief suggests (Br. at 54). By July 2016, Orsaio was not handling cases, but rather was performing polygraph examinations.

65

she sought to introduce to support her claim that Hess singled her out for a disproportionate assignment of cases. (*See* Br. at 54.) Exhibit 17 is a handwritten document purportedly showing that the Utica area office historically assigned two parole officers to the Otsego County caseload; Orsaio sought to introduce this evidence to corroborate her claim that, after winning a bid for the Otsego County caseload in August 2015, Hess blocked her from assuming that caseload. (JA81, 1917.) The district court had already rejected Orsaio's discrimination claims based on these very allegations, however. There thus was no reason to permit Orsaio to present detailed evidence of those failed discrimination claims to the jury. Instead, the court reasonably allowed her to offer testimony regarding the atmosphere at Utica, as well as the basis for, and nature of, her discrimination complaints, but held that the minimal relevance of this allegedly corroborating documentation was outweighed by the danger of confusing the issues and misleading the jury because it "distracts from the central issue," which is the retaliation Orsaio suffered because of her complaint. (JA81; *see also* JA2136.)

None of the cases on which Orsaio relies for her contrary argument undermines the reasonableness of the district court's ruling. Indeed,

*Hawkins v. Hennepin Tech. Ctr.*, 900 F.2d 153 (8th Cir. 1990), *Buckley v. Mukasey*, 538 F.3d 306 (4th Cir. 2008), and *Glass v. Philadelphia Electric Co.,* 34 F.3d 188 (3d Cir. 1994), are inapposite because none of them involved a plaintiff's attempt to establish motive for unlawful retaliation based on a claim of discrimination that had already been rejected by a court. The plaintiff in *Hawkins* sought to establish a Title VII retaliation claim based on complaints of sexual harassment against herself and others. She had not asserted a separate claim of sexual harassment however, and thus no such claim had even been considered by the court in her case. And the plaintiffs in *Buckley* and *Glass* sought to rely on evidence of their participation in prior litigation *sustaining* claims of discrimination for purposes of establishing retaliatory motives for subsequent adverse employment actions. Here, in contrast, Orsaio's claims of discrimination and hostile work environment were soundly *rejected* by the district court for failure to raise triable issues of fact as to them.

Even so, the courts in those cases did not hold that the plaintiffs should have been permitted to present an entire case of the purported past discrimination, as Orsaio sought to do here. Rather, they faulted the

67

trial-level courts for allowing virtually no information about the prior actions alleged to have motivated subsequent retaliation. In *Hawkins,* for example, the Eighth Circuit explained that "some detail" about the alleged harassment was necessary to provide context for the plaintiff's complaints to administrative personnel that she claimed had triggered retaliation. *Id.* at 156. The district court, however, had limited the proof "to bare allegations that complaints of sexual harassment were made, without some indication of the nature of the underlying incidents, [which] unfairly prevented Hawkins from fully presenting her claim." *Id.* Here, in contrast, even though the district court properly rejected at the summary judgment stage Orsaio's discrimination and hostile work environment claims, it allowed Orsaio to offer testimony about the basis for, and nature of, her discrimination complaints.

For similar reasons, the Court should reject Orsaio's argument (Br. at 55) that Hrovat and Hess's "bad acts" are admissible to prove pretext and damages.[22] The "bad acts" on which Orsaio seeks to rely are

---

[22] We note that Orsaio's brief (at 55) attributes to the opinion in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973) language that does not appear in that opinion.

alleged discriminatory actions or decisions that were properly rejected as discrimination claims at the summary judgment stage. They thus did not constitute bad acts.

Orsaio argues (Br. at 56) that the district court erred by excluding as double hearsay Orsaio's testimony that a coworker, parole officer Schwartz-Castillo, told her Hess didn't like her because she "don't like cock." (Br. at 56.) She is mistaken. The proffered testimony did not satisfy the requirement of Rule 801(d)(2)(D) that the alleged statement "was made by the party's agent or employee on a matter within the scope of that relationship and while it existed." Indeed, Orsaio has never argued that Schwartz-Castillo, a coworker but not a supervisor, is an agent of defendant or that he was speaking to "a matter within the scope of the agency." Nor did the proffered testimony qualify for the hearsay exception in Rule 803(1) as a present sense impression. Orsaio has never suggested that Schwartz-Castillo made the statement "while or immediately after" perceiving Hess's dislike for Orsaio. Indeed, the officer's use of that vulgar expression appears to be Schwartz-Castillo's choice, rather than a statement he attributed to Hess.

69

Finally, Orsaio describes in the background section of her brief (Br. at 22-23) the court's ruling precluding her from introducing evidence identified for the first time just two weeks before trial was scheduled.[23] By failing to present argument on the issue, she has abandoned any challenge to the court's ruling. And the ruling reflects a reasonable exercise of the court's discretion in any event, given the lack of notice sufficient for defendant's counsel to conduct an adequate investigation and prepare a response.

---

[23] That evidence, as discussed above, was offered for damages purposes, not as Orsaio's brief appears to suggest (Br. at 22-23), to establish additional discriminatory acts.

70

## CONCLUSION

This Court should affirm the judgment of the district court.

Dated:  Albany, New York
September 28, 2022

Respectfully submitted,

LETITIA JAMES
  *Attorney General of the*
  *State of New York*
Attorney for Appellee


By:   /s/  Sean P. Mix
SEAN P. MIX
Assistant Solicitor General

The Capitol
Albany, New York 12224
(518) 776-2010

BARBARA D. UNDERWOOD
  *Solicitor General*
ANDREA OSER
  *Deputy Solicitor General*
SEAN P. MIX
  *Assistant Solicitor General*
    *of Counsel*

71

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(g) of the Federal Rules of Appellate Procedure, Sean P. Mix, an employee in the Office of the Attorney General of the State of New York, hereby certifies that according to the word count feature of the word processing program used to prepare this brief, the brief contains 13,515 words and complies with the typeface requirements and length limits of Rule 32(a)(5)-(7).

 /s/ Sean P. Mix_____
 SEAN P. MIX